Filed 3/26/13; pub. order 4/25/13 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TAXPAYERS FOR ACCOUNTABLE SCHOOL BOND SPENDING,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>    Defendant and Respondent. | D060999<br><br><br>(Super. Ct. No.<br>  37-2011-00085714-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed in part, reversed in part and remanded with directions.

Plaintiff Taxpayers for Accountable School Bond Spending (Taxpayers) appeals a judgment entered against it in its action against defendant San Diego Unified School District (District) arising out of Proposition S and District's approval of installation of new stadium field lighting and other improvements at Hoover High School (Hoover). In its operative first amended complaint against District, Taxpayers alleged four causes of

action: (1) a Code of Civil Procedure section 526a cause of action for waste and misuse of Proposition S funds; (2) a California Environmental Quality Act (CEQA) cause of action for District's wrongful adoption of a mitigated negative declaration for the project at Hoover; (3) a cause of action for District's violation of the City of San Diego's (City) zoning and land use laws; and (4) a cause of action for District's violation of Government Code section 53094 by exempting the Hoover project and certain other high school projects from City's zoning and land use laws.  On appeal, Taxpayers generally contends the trial court erred because: (1) Proposition S did not specifically list or otherwise include field lighting for Hoover or other schools for funding from bond proceeds; (2) there is substantial evidence in the administrative record that the Hoover project may have a significant effect on the environment within the meaning of CEQA; and (3) District's resolution pursuant to Government Code section 53094 exempting Hoover and other high schools from City's zoning and land use laws is invalid because inadequate notice was given, the exemption of classroom and nonclassroom facilities is overbroad, and that exemption action is a project requiring compliance with CEQA.

FACTUAL AND PROCEDURAL BACKGROUND

On July 23, 2008, District's Board of Education (Board) approved a resolution to place on the November 4, 2008, election ballot a proposition (Proposition S) to authorize District to sell up to $2.1 billion in general obligation bonds for the construction, reconstruction, rehabilitation, or replacement of school facilities as listed or otherwise described in Exhibit A attached to the resolution, which set forth the full text of Proposition S.  Proposition S is entitled "San Diego School Repair and Safety Measure"

2

and contains a list of specific projects for Hoover, including projects to "[r]enovate/replace stadium bleachers, including press box" and to "[u]pgrade fields, track, and courts for accessibility compliance." On November 4, 2008, voters approved Proposition S.[1]

Soon thereafter, District began the CEQA review process for a proposed project to upgrade Hoover athletics facilities, including football stadium bleacher replacement and new lighting for the football field. In or about October 2010, District completed an initial study of the project under CEQA (Initial Study). The Initial Study described the proposed project (Project) as including "the construction and operation of upgraded athletic facilities on the Hoover High School campus in the City of San Diego. . . . In addition to upgrading the athletic facilities, the proposed project would include the installation of additional parking spaces, *stadium lighting*, and provide Americans with Disabilities Act (ADA) compliant facilities." (Italics added.) The Project would replace the football and track field home and visitor side bleachers and reduce the home side bleachers from 4,190 seats to 2,796 seats and the visitor side bleachers from 1,445 seats to 1,174 seats. The Project would also "[i]nstall new lighting for the football field (two 100 foot light standards on south side of football field and two 90 foot light standards on north side of football field). The field lighting would be focused and directed at the field

---

[1]    Although the parties do not cite, and the record does not appear to contain, any document showing the results of the Proposition S vote, the parties represent that the voters approved Proposition S, presumably by at least the 55 percent minimum vote required by article XIII A, section 1 of the California Constitution (Proposition 39). Accordingly, for purposes of this opinion, we presume the voters approved Proposition S.

area during school events, including sporting events (i.e., football, soccer, track) that occur after dusk. It is anticipated that field lighting will be dimmed at the conclusion of the event and after all patrons have safely exited the facility (estimated at 9:00 p.m.). Subsequently, the facility would be cleaned and the field lights will be extinguished (estimated at 10:00 p.m.)[.]" Furthermore, the Project included installation of a new public announcement (PA) system and construction of a 268-foot long, 11-foot high concrete masonry wall on the north side of the visitor bleachers parallel to Monroe Avenue, which wall would "serve to visually screen the bleachers from the surrounding neighborhood." The Project would also increase the number of on-campus parking spaces from 167 spaces to 223 spaces. Regarding the anticipated usage of the athletic facilities, the Initial Study stated:

> "Existing events conducted on the football field that were possible only during daylight hours or with temporary lights could now occur in the evening. These existing events include football, boys and girls soccer, and track and field. The District anticipates that approximately 15 evening events would occur with implementation of the [Project]. The traffic and crowd control measures currently in place for events at the school will be implemented for evening events made possible by the installation of stadium lighting, as determined necessary by school officials. The District notes that due to routine practices and the potential for unforeseen events, such as playoff games, a few more events may occur. . . ."

James Watts, District's director of planning, signed the Initial Study finding that noise was the only potentially significant impact of the Project on the environment and revisions were made to reduce that impact to less than significant. He stated that a mitigated negative declaration would be prepared for the Project.

4

On October 15, 2010, District published a notice of intent to adopt a mitigated negative declaration (MND) for the Project. A draft MND was made available to the public, which had 30 days to submit written comments regarding the draft MND. On October 25, District held a community meeting to discuss the Project and receive public input. District received, and prepared responses to, comment letters regarding the Project.

On January 11, 2011, the Board adopted a resolution finding there is no substantial evidence the Project, as mitigated, would have a significant effect on the environment. The Board also adopted the Initial Study and the MND, along with the mitigation monitoring and reporting program (MMRP) for the Project. On January 12, District filed a notice of determination with the County of San Diego, stating: (1) it had approved the Project; (2) the Project will not have a significant effect on the environment; (3) a negative declaration had been prepared for the Project; (4) mitigation measures were made a condition of approval of the Project; and (5) an MMRP was adopted for the Project.

On May 10, 2011, the Board approved a resolution pursuant to Government Code section 53094 exempting projects at Hoover and 11 other high schools, along with the school sites of those 12 high schools, from City's zoning and land use laws. On May 12, District served City with notice of its exemption action.

In February 2011, Taxpayers filed the instant action against District. In July 2011, Taxpayers filed its operative first amended complaint against District, alleging the four causes of action described above. The trial court set the hearing on the CEQA cause of

5

action for August 25 and the hearing on the non-CEQA causes of action for September 30. On September 27, the court issued a statement of decision dismissing Taxpayers's CEQA cause of action. On October 26, the court issued a statement of decision dismissing Taxpayers's non-CEQA causes of action. The trial court then entered judgment for District. Taxpayers timely filed a notice of appeal.

DISCUSSION

I

*Proposition S*

Taxpayers contends the trial court erred by dismissing its first cause of action because Proposition S did not specifically list or otherwise include field lighting for Hoover or other schools to be funded from bond proceeds, as required by the California Constitution for school facility bonds under Proposition 39.

A

" 'The usual method of funding new school construction in California has been for school districts to obtain voter approval for the issuance of general obligation bonds. . . . The bonds are repaid by an annual levy of an ad valorem tax on real (and certain personal) property located within the area of the district.' " (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1395 (*San Lorenzo*).) Article XIII A, section 1, subdivision (b), of the California Constitution provides an exception to the 1 percent ad valorem tax limit on real property to the extent certain bonds are approved by the voters, including:

6

"(2)  Bonded indebtedness for the acquisition or improvement of real property approved on or after July 1, 1978, by two-thirds of the votes cast by the voters voting on the proposition.

"(3)  Bonded indebtedness incurred by a school district . . . for the construction, reconstruction, rehabilitation, or replacement of school facilities, including the furnishing and equipping of school facilities, or the acquisition or lease of real property for school facilities, approved by 55 percent of the voters of the district . . . voting on the proposition on or after the effective date of the measure adding this paragraph.  *This paragraph shall apply only if the proposition* approved by the voters and resulting in the bonded indebtedness *includes all of the following accountability requirements*:

"(A)  A requirement that the proceeds from the sale of the bonds be used only for the purposes specified in Article XIII A, Section 1(b)(3), and not for any other purpose, including teacher and administrator salaries and other school operating expenses.

"(B)  *A list of the specific school facilities projects to be funded* and certification that the school district board . . . has evaluated safety, class size reduction, and information technology needs in developing that list.

"(C)  A requirement that the school district board . . . conduct an annual, independent performance audit to ensure that the funds have been expended only on the specific projects listed.

"(D)  A requirement that the school district board . . . conduct an annual, independent financial audit of the proceeds from the sale of the bonds until all of those proceeds have been expended for the school facilities projects."  (Italics added.)

California Constitution, article XIII A, section 1, subdivision (b)(3), was added when California voters passed Proposition 39 on November 7, 2000.  (Prop. 39, § 4, as approved by voters, Gen. Elec. (Nov. 7, 2000); Cal. Const., art. XXX A, § 1, subd. (b)(3).)  Prior to November 2000, school districts, like other government agencies, were required to attain a two-thirds vote for bonds to acquire or improve real property.  (Cal.

7

Const., art. XIII A, § 1, subd. (b)(2); *Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 19.)  Proposition 39, also known as the "Smaller Classes, Safer Schools, and Financial Accountability Act," reduced the required voter approval from two-thirds to 55 percent for a school facility bond proposition that satisfies its requirements, as quoted above.  (Prop. 39, § 4, as approved by voters, Gen. Elec. (Nov. 7, 2000); Cal. Const., art. XIII A, § 1, subd. (b)(3); *Foothill*, at p. 19.)  Education Code sections 15264 through 15284 implement Proposition 39.  (*San Lorenzo*, *supra*, 139 Cal.App.4th at p. 1396, fn. 9; *Foothill*, at p. 20.)

B

"In interpreting a voter initiative, we apply the same principles that govern our construction of a statute.  [Citation.]  We turn first to the statutory language, giving the words their ordinary meaning.  [Citation.]  If the statutory language is not ambiguous, then the plain meaning of the language governs.  [Citation.]  If, however, the statutory language lacks clarity, we may resort to extrinsic sources, including the analyses and arguments contained in the official ballot pamphlet, and the ostensible objects to be achieved."  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006.)  We apply the same rules when interpreting constitutional and statutory provisions.  (See, e.g., *Committee for Responsible School Expansion v. Hermosa Beach City School Dist.* (2006) 142 Cal.App.4th 1178, 1186 (*Hermosa*).)  "If the language is clear and unambiguous[,] there is no need for construction, nor is it necessary to resort to indicia of the intent . . . of the voters . . . ."  (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  Furthermore, "[c]ourts should interpret statutes or written instruments so as to give force and effect to

8

every provision and not in a way which would render words or clauses nugatory, inoperative or meaningless." (*Hermosa*, at p. 1189.)

Because interpretation of a constitutional provision or voter initiative is a question of law, we perform that interpretation de novo, or independently, and are not bound by the trial court's analysis or conclusion. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836 [independent interpretation of voter initiative as a question of law]; cf. *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1502 [independent interpretation of statute as a question of law].)

C

The November 2008 election ballot included the following description of Proposition S:

> "SAN DIEGO SCHOOL REPAIR AND SAFETY MEASURE. To improve every neighborhood school by[:] repairing outdated student restrooms, deteriorated plumbing and roofs; upgrading career/vocational classrooms and labs; providing up-to-date classroom technology; improving school safety/security; replacing dilapidated portable classrooms; upgrading fire alarms; and removing hazardous substances; shall San Diego Unified School District issue $2,100,000,000 in bonds at legal interest rates, requiring independent citizen oversight, annual audits, NO money for administrators, and bonds issued only if NO estimated tax rate increase?"

The voters' pamphlet included the full text of Proposition S. Proposition S stated its purpose was "[t]o provide financing for the specific school facilities projects listed in the Bond Project List below." It required District to "establish an independent Citizens' Oversight Committee . . . to ensure bond proceeds are spent only for the school facilities projects listed in the Bond Project List" and "conduct an annual, independent

9

performance audit to ensure that the bond proceeds have been expended only on the school facilities projects listed in the Bond Project List."

Proposition S then set forth its "Bond Project List," consisting of two parts. Part One of the Bond Project List authorized: (1) each school site to allocate $150 per student of bond proceeds to be spent on qualified, permitted projects; and (2) specific projects "to be completed at each or any of the District's sites." Those specific projects to be completed at all school sites under Part One included: (1) certain improvements to support student health, safety, and security (e.g., "[p]rovide school site security improvements, including increased lighting, and vandalism and intrusion safeguards"); (2) certain projects to improve school accessibility and code compliance upgrades (e.g., "[m]odernize and renovate physical education facilities, playgrounds and fields for accessibility and safety"); and (3) certain improvements to support student learning and instruction.

In addition to the specific projects generally authorized for all schools in Part One, Part Two listed specific projects authorized to be completed for particular school sites. Part Two of Proposition S authorized 26 specific projects to be completed at Hoover, including:

"Projects to Improve School Accessibility, Code Compliance Upgrades

- Renovate existing restrooms and locker rooms
- Renovate gymnasium building to meet accessibility regulations
- Provide accessible, compliant wrestling room

10

- Improve accessibility to all classrooms, labs, restrooms, and other school facilities to comply with accessibility regulations, including ADA Titles I & II
- Install three-compartment sink and hand sink in kitchen
- *Renovate/replace stadium bleachers*, including press box
- *Upgrade fields*, track, and courts *for accessibility compliance*
- Build new two-story classroom building to replace old portable classrooms
- Provide accessible restrooms with storage for athletic equipment"  (Italics added.)

After listing specific projects for particular school sites, Part Two set forth three additional projects that were not for particular sites.[2]

Most importantly for this appeal, Proposition S then authorized bond proceeds to be used for election, bond, construction and other costs incidental to and necessary for completion of its listed projects, stating:

> "*Each project listed is assumed to include* its share of costs of the election and bond issuance and other construction-related costs, such as construction management, architectural, engineering, inspection and other planning costs, legal, accounting and similar fees, independent annual financial and performance audits, a customary construction contingency, and *other costs incidental to and necessary for completion of the listed projects* (whether work is performed by the District or by third parties), *including*: [¶] . . . [¶]
>
> - Repair, upgrade, modify, expand, refinish, replace and construct site improvements, including off-street parking areas, pickup/dropoff, signage, paths, sidewalks and walkways, canopies, hard courts (student play areas), athletic

---

[2]     Those additional projects to be completed were: (1) "[p]rovide matching funds to construct classrooms and schools to accommodate enrollment growth for new housing developments in the Miramar area;" (2) "[r]etrofit and build classrooms, labs and facilities to improve specialized instruction;" and (3) "[p]rovide matching funds to construct classrooms and schools in the downtown area to meet educational needs of the [D]istrict."

11

play fields, landscaping, irrigation, permanent athletic field equipment and facilities (including nets, basketball standards, goals and goalposts, backstops), *field lighting*, etc."  (Italics added.)

D

Taxpayers contends the trial court erred by interpreting Proposition S as specifically including and authorizing new field lighting for Hoover's football stadium. Based on our independent interpretation of the plain language of Proposition S, we agree the court so erred.

We italicized above Proposition S's relevant, and ultimately dispositive, language. In support of its position that field lighting is specifically listed and authorized by Proposition S, District relies solely on the words "field lighting" contained in the last paragraph of Part Two.  However, contrary to District's apparent assertion, those words do not stand alone as an independently listed project for Hoover and all other school sites. Rather, the words "field lighting" must be read in the context of all the language of Proposition S and, in particular, Part Two.  District does not assert, and could not reasonably assert, there is any provision in Part One that could reasonably be interpreted as including, either expressly or implicitly, new stadium lighting for Hoover. Accordingly, we examine the language of Part Two to determine whether it could support District's proposed interpretation.  As noted above, Part Two lists specific projects to be completed for particular school sites.  Regarding Hoover, Part Two specifically lists two projects relating to its football stadium: "[r]enovate/replace stadium bleachers, including press box" and "[u]pgrade fields, track, and courts for accessibility compliance."  The

12

first project relates to the stadium's bleachers and press box. The plain and ordinary meaning of "bleachers" is the structure that provides seating for those who attend stadium events.[3] The renovation or replacement of the stadium's seating does not expressly include lighting for the field, and it cannot reasonably be argued that field lighting is implicitly included in that project. Likewise, it cannot reasonably be argued that field lighting is expressly or implicitly included in the renovation or replacement of the stadium's press box.

Regarding the second project relating to Hoover's football stadium, Part Two of Proposition S specifically authorizes the use of bond proceeds to "[u]pgrade fields, track, and courts for accessibility compliance." As that language pertains to Hoover's football field, the plain and clear meaning of Part Two authorizes the use of bond funds to upgrade the football field "for accessibility compliance." Part Two does *not* authorize a "general" or nonspecific upgrading of the football field, which arguably could include the addition of new field lighting. Rather, the qualifying phrase "for accessibility compliance" places a specific limitation on the nature and extent of the upgrade to the football field. Any upgrade to the football field must be "for accessibility compliance," which, in general, means compliance with ADA laws and regulations so that disabled persons can access and use the field as required by law. District does not cite, and we are not aware of, any ADA law or regulation that could reasonably be construed as requiring

---

3    Because it is common knowledge what "bleachers" are, we need not further describe them.

football field lighting as proposed in the Project (i.e., two 90-foot standards and two 100-foot standards with a total of 60 luminaires that each produce an average of 134,000 lumens). Therefore, it cannot reasonably be argued that field lighting is expressly or implicitly included in the upgrading of the football field for accessibility compliance, as specifically listed in and authorized by Part Two.

Because the projects specifically listed in and authorized by Part Two for Hoover's football stadium, as well as the projects specifically listed and authorized by Part One for all school sites, as we concluded above, do not include stadium field lighting, we look to other language in Proposition S that arguably could authorize that lighting. The only other language in Proposition S that arguably could support funding for Hoover's new field lighting, and the only language on which District relies, are the words "field lighting" contained in the last paragraph of Part Two. However, those words do not stand alone in that paragraph as an independent, or separately listed, project. Rather, as quoted above, those words are preceded by language in that paragraph that plainly and clearly indicates "field lighting" is authorized *only* to the extent it is "incidental to and necessary for completion of the listed projects." After deleting irrelevant language from that paragraph, it provides: "Each project listed is assumed to include . . . *other costs incidental to and necessary for completion of the listed projects . . .* , including [¶] . . . [¶] . . . field lighting." (Italics added.) Therefore, to the extent Proposition S did not expressly include certain costs in its prior authorization of specifically listed projects, Part Two's final paragraph authorizes the use of bond funds to pay for "other costs incidental to and necessary for completion of the listed projects." Those "other costs"

14

directly relate to, and are based on, the projects specifically listed in Proposition S. Furthermore, those "other costs" are authorized by Proposition S only to the extent those costs are "incidental to and necessary for completion of" the specifically listed projects.

In this context, we conclude the only reasonable interpretation of the words "field lighting" in the final paragraph of Part Two is the authorization to use bond funds to pay for "field lighting" costs "incidental to and necessary for completion of" the projects specifically listed in Proposition S. In the instant matter, the use of bond funds to pay for "field lighting" for Hoover's football stadium would be authorized *only if* that lighting was incidental to and necessary for completion of a project specifically listed in Proposition S for Hoover. Contrary to District's assertion, new "field lighting" for Hoover's football stadium is *not* an independent, specifically listed project of its own in Proposition S. Rather, "field lighting" must be tethered to, and based on, a listed project expressly authorized elsewhere in Proposition S. Absent that tether, the use of Proposition S bond proceeds to pay for "field lighting" is not authorized for Hoover's football stadium. Based on our reading of Proposition S, there is no listed project for Hoover that provides that tether and authorizes funding for field lighting. Part Two does not specifically list any project to which field lighting could be tethered under the final paragraph of Part Two. As discussed above, Part Two specifically lists certain projects for Hoover, including: "[r]enovate/replace stadium bleachers, including press box" and "[u]pgrade fields . . . for accessibility compliance." Neither of those specifically listed projects can reasonably be construed as including field lighting as "incidental to and necessary for [their] completion." Field lighting is *not* incidental to and necessary for the

15

completion of the renovation or replacement of the stadium bleachers or the press box. Likewise, field lighting is *not* incidental to and necessary for the completion of the upgrading of the football field for accessibility compliance. We conclude Proposition S does *not* authorize the use of bond funds to pay for new field lighting for Hoover's football stadium or for other high schools' stadiums for which Proposition S did not specifically list field lighting as part of their projects. The trial court erred by concluding otherwise and dismissing Taxpayers's first cause of action.

E

District asserts Taxpayers did not have standing to challenge its use of Proposition S bond funds to pay for new field lighting for Hoover's football stadium. District argues Taxpayers lacks standing under Education Code section 15284, subdivision (a), because it has not alleged any individual harm.

However, Taxpayers's first amended complaint did not assert standing under Education Code section 15284, subdivision (a), but rather Code of Civil Procedure section 526a. That statute provides:

> "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or within one year before the commencement of the action, has paid, a tax therein. . . ."

In its first amended complaint, Taxpayers alleged it "is a not-for-profit registered fictitious business entity . . . and is intended to operate as a tax exempt nonprofit

16

corporation, which along with its members and supporters, [who] reside within [City] and within the boundaries of the District, are residents and taxpayers within said geographical area of the District and have paid taxes within at least the last fiscal and calendar tax years." Taxpayers further alleged it had "standing to enforce such laws that are designed to control the expenditure of public-approved school bond money and protect and enjoin against inappropriate use of said moneys."

District does not argue Taxpayers's members would not have standing as individuals to assert the instant cause of action, but rather that Taxpayers, as a representative organization, does not have standing because it does not pay taxes as an organization. However, District does not cite, and we are not aware of, any case that holds a representative organization cannot bring a taxpayer action under Code of Civil Procedure section 526a or a citizen action if that organization represents members who, as individuals, would have standing to personally bring that cause of action. On the contrary, it has been held a representative organization or association may have standing to bring an action if its members would have had standing to bring that action as individuals. (*Driving Sch. Assn. of Cal. v. San Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513, 1517.) *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 29, stated:

> "Code of Civil Procedure *section 526a permits a taxpayer to bring an action to restrain or prevent an illegal expenditure of public money.* No showing of special damage to a particular taxpayer is required as a requisite for bringing a taxpayer suit. [Citation.] Rather, taxpayer suits provide a general citizen remedy for controlling illegal governmental activity. [Citation.]

17

"Citizen suits may be brought without the necessity of showing a legal or special interest in the result where the issue is one of public right and the object is to procure the enforcement of a public duty. [Citation.] Citizen suits promote the policy of guaranteeing citizens the opportunity to ensure that governmental bodies do not impair or defeat public rights. [Citation.]

"Taxpayer suits and citizen suits are closely related concepts of standing. [Citation.] The chief difference is a taxpayer suit seeks preventative relief, to restrain an illegal expenditure, while a citizen suit seeks affirmative relief, to compel the performance of a public duty. [Citation.] *Where standing appears under either rule, the action may proceed regardless of the label applied by the plaintiff.*" (Italics added.)

Furthermore, "[t]he primary purpose of [Code of Civil Procedure section 526a], originally enacted in 1909, is to 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.' [Citation.] [¶] California courts have consistently construed [Code of Civil Procedure] section 526a liberally to achieve this remedial purpose." (*Blair v. Pitchess* (1971) 5 Cal.3d 258, 267-268.) Liberally construing Code of Civil Procedure section 526a, we conclude Taxpayers has standing to bring the instant cause of action on behalf of its members who are residents of City and District and are taxpayers. (Cf. *Los Altos Property Owners Assn. v. Hutcheon* (1977) 69 Cal.App.3d 22, 24 [unincorporated association of property owners brought Code of Civil Procedure section 526a taxpayer action against school district]; *Hermosa*, *supra*, 142 Cal.App.4th at pp. 1181, 1186 [taxpayers' committee, apparently an unincorporated association, brought Education Code section 15284 action against school district to enjoin spending Proposition 39 bond proceeds on school gymnasium]; *Common Cause v. Board of*

18

*Supervisors* (1989) 49 Cal.3d 432, 439-440 [plaintiffs had sufficient interest as citizens to bring action for injunction].)

Because Taxpayers correctly alleged it had standing under Code of Civil Procedure section 526a, we need not address whether it also had standing on other grounds. We need not address District's assertion that Taxpayers did not have standing under Education Code section 15284, subdivision (a),[4] to challenge Proposition S. In any event, we note Education Code section 15284, subdivision (c), provides that actions challenging the expenditure of Proposition 39 bond funds may also be brought under other laws.[5] Because Education Code section 15284 does not provide the exclusive means for Taxpayers to challenge District's use of Proposition S bond funds, Taxpayers could properly bring, and had standing to bring, a taxpayer action under Code of Civil Procedure section 526a to challenge District's use of Proposition S bond funds.[6]

---

[4] Education Code section 15284, subdivision (a), provides: "An action to obtain an order restraining and preventing any expenditure of funds received by a school district . . . through the sale of bonds authorized by this chapter pursuant to paragraph (3) of subdivision (b) of Section 1 of Article XIII A of the California Constitution . . . may be maintained against any officer, agent, or other person acting on behalf of, that school district . . . , by a citizen residing in the school . . . district who is assessed and is liable to pay an ad valorem tax on real property within the school . . . district, or who has paid an ad valorem tax on real property within the school . . . district within one year before the commencement of the action . . . ."

[5] Education Code section 15284, subdivision (c), provides: "The rights, remedies, or penalties established by this section are cumulative to the rights, remedies, or penalties established under other laws, including subdivision (a) of Section 526 of Chapter 3 of Title 7 of Part 2 of the Code of Civil Procedure."

[6] Based on the same reasoning, we need not address District's argument that it was not a proper defendant under Education Code section 15284, subdivision (a). In any

## II

### *CEQA*

Taxpayers contends the trial court erred by dismissing its second cause of action alleging District violated CEQA because there is substantial evidence in the administrative record that the Project may have a significant effect on the environment. Taxpayers also asserts the MND's description of the Project was inaccurate and misleading.

### A

*General Principles.* "CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.)

"CEQA requires a governmental agency [to] prepare an environmental impact report (EIR) whenever it considers approval of a proposed project that '*may* have a *significant* effect on the environment.' ([Pub. Resources Code,] § 21100, italics added.)

event, we doubt that statute should be interpreted so narrowly as to preclude an action against the entity (e.g., school district) allegedly improperly spending Proposition 39 bond funds.

20

In addition to the intent to require governmental decision makers to consider the environmental implications of their decisions, the Legislature in enacting CEQA also intended to provide certain substantive measures for protection of the environment. [Citations.] In particular, one court noted [Public Resources Code] section 21002 requires public agencies 'to deny approval of a project with significant adverse effects when feasible alternatives or feasible mitigation measures can substantially lessen such effects.' [Citation.] [¶] If there is no substantial evidence a project 'may have a significant effect on the environment' or the initial study identifies potential significant effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. [Citations.] However, the Supreme Court has recognized that CEQA requires the preparation of an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 . . . ; see also *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 . . . .) Thus, if substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur [and will not be mitigated], an EIR is required and a negative declaration cannot be certified." (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1601-1602, fn. omitted.) CEQA "creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review [i.e., an EIR] . . . ." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316-1317 (*Sierra Club*).)

21

"A negative declaration is a written statement that briefly explains why a project will not have a significant environmental impact and therefore will not require an EIR. [Citation.] A negative declaration is proper only if the agency determines based on an initial study that there is no substantial evidence that the project may have a significant effect on the environment. [Citations.] If an initial study shows that the project may have a significant effect on the environment, a *mitigated* negative declaration may be appropriate. A mitigated negative declaration is proper, however, only if project revisions would avoid or mitigate the potentially significant effects identified in an initial study 'to a point where clearly no significant effect on the environment would occur, and . . . there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment.' " (*Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 330-331 (*Mejia*).) In that context, "may" means a *reasonable possibility* of a significant effect on the environment. (Pub. Resources Code, §§ 21082.2, subd. (a), 21100, 21151, subd. (a); *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927 (*Pocket Protectors*); *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 904-905.)

A " 'significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068.) The CEQA Guidelines (Cal. Code of Regs., tit. 14, § 15000 et seq.; hereafter Guidelines) define "[s]ignificant effect on the environment" as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by

22

the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant."[7] (Guidelines, § 15382.) " 'Substantial evidence' . . . means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Substantial evidence "shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384, subd. (b).) "Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).)

"The fair argument standard is a 'low threshold' test for requiring the preparation of an EIR. [Citations.] It is a question of law, not fact, whether a fair argument exists, and the courts owe no deference to the lead agency's determination. Review is de novo, *with a preference for resolving doubts in favor of environmental review*. [Citations.] [¶]

---

7 The Guidelines define the "environment" as "the physical conditions which exist within the area which will be affected by a proposed project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. The area involved shall be the area in which significant effects would occur either directly or indirectly as a result of the project. The 'environment' includes both natural and man-made conditions." (Guidelines, § 15360; see Pub. Resources Code, § 21060.5.)

23

Although our review [of the agency's and trial court's decisions] is de novo and nondeferential, however, we must ' "giv[e] [the lead agency] the benefit of [the] doubt on any legitimate, disputed issues of credibility." ' [Citations.] . . . [¶] Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence for a fair argument. [Citations.] So may expert opinion if supported by facts, even if not based on specific observations as to the site under review. [Citation.] . . . [¶] . . . [M]ere argument, speculation, and unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument. [Citations.] . . . Neither is the mere possibility of adverse impact on a few people, as opposed to the environment in general." (*Pocket Protectors*, *supra*, 124 Cal.App.4th at pp. 928-929, fn. omitted.) On appeal, we review the trial court's findings and conclusions de novo. (*Mejia*, *supra*, 130 Cal.App.4th at p. 332.)

In determining de novo whether there is substantial evidence to support a fair argument that a proposed project may have a significant effect on the environment, "we limit our review to evidence in the administrative record [i.e., the whole record before the public agency]." (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1111 (*Architectural Heritage*); see also Pub. Resources Code, §§ 21064.5, 21080, subds. (c) & (d), 21082.2, subds. (a) & (d).) Our review "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the [public agency's] determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) "A court reviewing an agency's decision not to prepare an

24

EIR in the first instance must set aside the decision if the administrative record contains substantial evidence that a proposed project might have a significant environmental impact; in such a case, the agency has not proceeded as required by law." (*Sierra Club*, *supra*, 6 Cal.App.4th at p. 1317.)

B

*Number of Events.* Taxpayers first asserts District's negative declaration was an abuse of discretion because its description of the Project in the Initial Study was misleading to the general public and the Board. Taxpayers argues that description of the anticipated number of evening events was misleading and caused District to underestimate, or inadequately address, the Project's potential environmental effects.[8]

Regarding the Project's anticipated events and attendance at the stadium, the Initial Study stated:

> "Existing events conducted on the football field that were possible only during daylight hours or with temporary lights could now occur in the evening. These existing events include football, boys and girls soccer, and track and field. *The District anticipates that approximately 15 evening events would occur* with implementation of the [Project]. . . . The District notes that *due to routine practices and the potential for unforeseen events, such as playoff games, a few more events may occur. . . .*"[9] (Italics added.)

---

[8]     Taxpayers also challenges the Initial Study's description of the change in attendance at Hoover football stadium events from the baseline attendance before the Project to the expected attendance were the Project to be completed. We address that issue below in the section on traffic and parking effects.

[9]     Although the Initial Study did not state the period of time over which those 15 events would occur, the parties presume, and we believe it can be reasonably implied, that the Initial Study intended to state approximately 15 evening events *per year* would occur.

25

Taxpayers contends that description was misleading because it did not place a limit on the number of evening events that would be held each year. Under CEQA, a public agency must determine what, if any, effect on the environment a proposed project may have. To do so, a public agency must first make a fair assessment of existing physical conditions (i.e., baseline physical conditions) and then compare it to the anticipated or expected physical conditions were the project to be completed, thereby allowing the agency to focus on the nature and degree of changes expected in those physical conditions after the project and whether those changes result in any significant effect on the existing environment. (Guidelines, § 15125, subd. (a); *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319-321, 328 (*Communities*); *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 955 ["An EIR [or initial study] must focus on impacts to the existing environment, not hypothetical situations."].) "[T]he comparison must be between existing physical conditions without the [project] and the conditions expected to be produced by the project. Without such a comparison, the EIR [or initial study] will not inform decision makers and the public of the project's significant environmental impacts, as CEQA mandates." (*Communities*, at p. 328.)

In this case District was required to make a fair assessment or estimate of the number of evening events to be held at Hoover's football stadium were the Project to be completed. In the Initial Study, District stated it anticipated "approximately 15 evening events" per year would be held were the Project to be completed. However, it added the

26

caveat that due to routine practices and unforeseen events (e.g., possible playoff games), "a few more events may occur." A reasonable interpretation of that language is that District anticipates 15 evening events per year will be held at Hoover's stadium, but a few more events could be held. It is common knowledge that a "few" consists of a small number (i.e., more than one and typically about three or four). Therefore, the Initial Study in effect stated District expected between 15 and 18 or 19 evening events per year. We do not conclude District's description of the Project in that regard was inaccurate or misleading to the Board or the general public.

Furthermore, Taxpayers does not cite any case, statute, regulation, or other authority persuading us that District was required to place a finite limit on the number of evening events to be held each year were the Project to be completed.[10] Nevertheless, if the Project is completed and District thereafter proposes to increase the actual number of evening events held to a number substantially greater than the 15-to-19 range, District may be required to conduct an additional CEQA review to determine whether the increased number of events may result in a significant effect on the environment.

C

*Field lighting.* Taxpayers asserts a fair argument exists whether the installation of field lighting for Hoover's football stadium may have a significant effect on the aesthetics of the neighborhood. Taxpayers argues the installation of two 100-foot standards and

---

[10] Taxpayers likewise does not cite any case, statute, regulation, or other authority persuading us that District was required to identify each type of use expected to be made of Hoover's football stadium were the Project to be completed.

27

two 90-foot standards with a total of 60 luminaires (i.e., light fixtures) would result in light trespassing onto neighboring residences, causing a significant increase in the amount of light in the environment during evening events at Hoover's stadium. It also argues the stadium lighting would degrade the existing visual character of the neighborhood.

The Initial Study described the new field lighting that would be installed at Hoover's football stadium, stating: "[T]wo 100 foot light standards on south side of football field and two 90 foot light standards on north side of football field [would be installed]. The field lighting would be focused and directed at the field area during school events, including sporting events (i.e., football, soccer, track) that occur after dusk. It is anticipated that field lighting will be dimmed at the conclusion of the event and after all patrons have safely exited the facility (estimated at 9:00 p.m.). Subsequently, the facility would be cleaned and the field lights will be extinguished (estimated at 10:00 p.m.)." Appendix A to the Initial Study is a copy of the lighting impact study conducted for District by T&B Planning Consultants (T&B) regarding the potential impact of the Project's stadium lighting on the environment. T&B described the proposed stadium lighting system, stating:

> "Proposed artificial lighting improvements include installation of the Musco Light-Structure Green™ sports lighting system at the football field. . . . Two light standards would be constructed at the home side of the field (southern portion of the site) and two light standards would be constructed at the visitors' side of the field (northern edge of the site), as depicted on Figure 3-3, *Lighting Plan*. The light elements proposed for the home side of the field would consist of two (2) 100-foot tall galvanized steel poles with each featuring 15 luminaires. The light elements proposed for the visitors' side of the

28

field would consist of two (2) 90-foot tall galvanized steel poles with each featuring 15 luminaires.  Combined, a total of 60 luminaires would be provided on-site.  Each luminaire would feature a 1500-watt metal halide fixture (producing an average of 134,000 lumens), a 14-inch external visor to reduce glare, and a reflective insert to focus light onto the playing field and reduce spill light.

"According to manufacturer's specifications, the Musco Light-Structure Green™ includes a light spill and glare control system that is designed to minimize off-site impacts from the sports lighting system.  The reflector and external visor are designed so the majority of the light is in the lower portion of the beam, and direct line of [sight] to the lamp (source of glare) is minimized when viewed from surrounding areas.  Each fixture housing has reflective inserts which direct, shift, and focus light onto the field and reduce spill and glare."

T&B stated the Project would have an adverse lighting impact (i.e., significant effect on the environment) if it would produce a substantial amount of light pollution, including sky glow, light trespass or glare.  It concluded the Project's sky glow and glare would have a less than significant impact.  Regarding light trespass, T&B reviewed the standards adopted by three professional and/or industry organizations for limiting light trespass onto adjacent residential properties in areas of medium ambient brightness that include urban residential areas like those in which the Project is located.[11]  Based on its review, T&B established a threshold of CEQA significance for light trespass for the Project if illuminance exceeded 0.8 foot-candles during precurfew hours and 0.2 foot-candles during postcurfew hours, as measured on horizontal and vertical planes at the property line of any adjacent residence.  T&B stated: "The potential for sleep disruption

---

[11]     Those organizations were the Institution of Lighting Engineers, Illuminating Engineering Society of North America, and the Electric Power Research Institute.

is the critical component in determining the level of impact for light trespass." T&B's analysis of the Project's light impact was based on a photometric analysis conducted by Musco Lighting, the Project's lighting system designer.

Most importantly for purposes of this appeal, T&B concluded the vertical illuminance caused by the Project would not significantly impact the residences located west of Highland Avenue. It stated:

> "[I]mplementation of the Project would result in the contribution of approximately 0.26-1.46 vertical foot-candles at various off-site locations, as calculated from adjacent residential property lines [west of Highland Avenue]. [¶] However, it is important to note that the calculations depicted on Figure 5-1 do not account for the landscaping proposed as part of the Project, which would include approximately 13 trees along the boundary with Highland Avenue. . . . With maturity of landscaping, these trees would therefore obstruct most line-of-[sight] views to the site, with exception of several gaps measuring between 0 to 10 feet where tree canopies would not overlap.

T&B noted that an area along Highland Avenue would be subjected to precurfew illuminance ranging from 0.89 to 1.46 vertical foot-candles, but that on maturity of the Project's proposed trees illuminance would not exceed 0.8 vertical foot-candles and therefore would be less than significant. Furthermore, before maturity of the Project's proposed trees, T&B stated:

> "[I]t is unlikely that operation of the proposed lighting system would result in significant adverse impacts related to light trespass. In urbanized locations, like the Project site and surrounding areas, the most common adverse effect of light trespass is disruption of sleep. Although the [Project] would create spill light that would result in light trespass on adjacent residential properties during pre-curfew hours, lighting would be dimmed by 9:00 [p.m.] daily and extinguished by 10:00 [p.m.] daily, and the nearby residential areas are located in an area of medium ambient brightness and the small

30

increase in light trespass is considered a less than significant impact."

Likewise, as to postcurfew impacts, T&B concluded the restriction on hours of operation of the stadium lighting (i.e., dimming by 9:00 p.m. and extinguishing by 10:00 p.m.) would avoid light trespass during sleeping hours and the "infrequent use" of the stadium lighting (i.e., approximately 15 evening events per year) "would help minimize the incidence of potential adverse light trespass impacts to nearby residences until the proposed landscaping has reached maturity." T&B concluded the potential for light trespass impacts would be less than significant both in the near-term before maturity of the Project's landscaping and in the long-term after maturity of that landscaping.

Based on our independent review of the administrative record, we conclude there is no substantial evidence in the record showing the Project's lighting elements may have a significant effect on the environment. (Pub. Resources Code, § 21100; *No Oil, Inc. v. City of Los Angeles*, *supra*, 13 Cal.3d at p. 75; *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 6 Cal.4th at p. 1123.) Taxpayers implicitly relies on two factors set forth in Appendix G to the Guidelines as showing the Project may have a significant effect on aesthetics: (1) the Project would substantially degrade the existing visual character or quality of the site and its surroundings; and/or (2) the Project would create a new source of substantial light or glare that would adversely affect day or nighttime views in the area. (Guidelines, append. G, § I, subds. (c) & (d).) However, Taxpayers has not persuaded us there is substantial evidence to support a

31

finding that either or both of those factors shows the Project may have a significant effect on the environment.

First, the lighting impact study concluded, as discussed above, the Project's lighting elements would not have a significant impact on the environment, citing the stadium lighting's limited hours of operation, limited number of evening events, landscaping features, and limited number of residences affected by light trespass. Figure 5-1 of the study showed the level of vertical foot-candles caused by the Project's stadium lighting at various points near residences along Highland Avenue and other neighborhood streets. Only a small number of residences in the neighborhood would be impacted by vertical foot-candle levels in excess of the established significance threshold of 0.8 foot-candles. Our review of Figure 5-1 shows that, at most, seven residences on Highland Avenue would be so impacted.[12] The light trespass on those residences would range from 0.89 vertical foot-candles to 1.46 vertical foot-candles. Although based solely on the threshold of significance adopted by T&B (i.e., 0.8 foot candles) it could be argued the stadium lighting may therefore have a significant impact on the neighborhood, we conclude that, considering all the circumstances in this case, there is no substantial evidence the lighting may have a significant impact on the neighborhood. The limited

---

12    Also, one residence on Monroe Avenue would be impacted by 0.82 vertical foot-candles and possibly one residence beyond the northeast corner of the stadium would be impacted by 0.89 vertical foot-candles. However, the de minimis nature and extent of that light trespass, combined with the limited operating hours and limited number of evening events, shows light trespass could not, as a matter of law, reach the level of significance for purposes of CEQA in the circumstances of this case.

operating hours of the stadium lighting (i.e., lighting dimmed at 9:00 p.m. and extinguished at 10:00 p.m.) and limited number of evening events (approximately 15 per year), when considered with the small number of residences affected (about seven residences), do not support a fair argument that the Project's stadium lighting may have a significant effect on the environment.[13] Considering the most common adverse effect of light trespass apparently is disruption of sleep, there is no substantial evidence in the record to support a finding that it is reasonably possible a substantial number of persons living in the neighborhood around Hoover may be significantly deprived of sleep and thereby significantly impacted by the stadium lighting. We conclude there is no substantial evidence that the Project's stadium lighting may have a significant effect on the environment by means of significant light trespass (or glare or sky glow).[14]

Second, Taxpayers asserts the Project's stadium lighting may have a significant effect on the environment because the lighting will have an "impact on the feel and quality of the neighborhood." It notes Talmadge is a neighborhood of potentially historic

---

[13]     Furthermore, in the long-term any light trespass apparently will be further reduced when the Project's landscaping (e.g., trees) matures. To the extent Taxpayers argues the stadium lighting may have a significant effect on the environment because District has not committed to limiting the number of evening events to 15 per year, we addressed that issue above and concluded District's description of the Project in effect stated the stadium lighting would be used from 15 to about 19 evening events per year. Any substantial increase beyond that range may require future review under CEQA.

[14]     To the extent Taxpayers asserts there may be a significant effect on the environment if the lights can merely be seen from the neighborhood, it does not cite any authority supporting that assertion, and we are not persuaded the threshold for significance is or should be set so low.

33

significance, with unique homes, narrow streets, and historic lamp posts. It asserts "[t]he direct visual impact of very tall modern stadium lights is completely out of character with [the] historic nature of Talmadge." However, based on our review of the whole record, we conclude the addition of four tall lighting standards to an existing, albeit renovated, stadium cannot reasonably be considered to have a substantial direct visual impact on the surrounding neighborhood that would constitute a significant effect on the environment.

Contrary to Taxpayers's assertion, the testimony of a community member that "we want to come home to peace and calm, not bright lights and noise" does not constitute substantial evidence showing the lighting may have a significant effect on the environment. "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492.) Furthermore, "[t]he possibility of significant adverse environmental impact is not raised simply because of individualized complaints regarding the aesthetic merit of a project." (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 376.)

D

*Historical resources*. Taxpayers also asserts a fair argument exists whether the Project would have a significant effect on historical resources in Hoover's neighborhood. It argues the MND and Initial Study did not adequately describe the historical nature of the neighborhood surrounding Hoover. It further argues District did not analyze whether the Project would potentially impact the neighborhood's historical resources.

34

The Initial Study described the area surrounding the Project, stating in part: "The [P]roject site is located in a built-out urban area and is surrounded by residential and commercial uses." On the question whether the Project would cause a substantial adverse change in the significance of a historical resource, the Initial Study stated:

> "The [P]roject site is currently developed within an existing high school campus in an urbanized area. The site is not listed on the State of California's Office of Historic Preservation (SHPO) list for San Diego County as required by [Guidelines] Section 15064.5 (SHPO, 2009). There are no historic structures occurring on-site. Furthermore, no buildings associated with the school campus would be demolished or altered as part of the [Project]. As the [P]roject would replace or upgrade existing facilities on-site, it is not anticipated to alter the historic context of the area. Therefore, no impact is identified for this issue area."

District concluded the Project would have no impact on a historical resource.

Public Resources Code section 21084.1 provides:

> "A project that may cause a substantial adverse change in the significance of an historical resource is a project that may have a significant effect on the environment. For purposes of this section, an historical resource is a resource listed in, or determined to be eligible for listing in, the California Register of Historical Resources. Historical resources included in a local register of historical resources . . . are presumed to be historically or culturally significant for purposes of this section . . . . The fact that a resource is not listed in, or determined to be eligible for listing in, the California Register of Historical Resources [or] not included in a local register of historical resources . . . shall not preclude a lead agency from determining whether the resource may be an historical resource for purposes of this section."

CEQA does not require formal listing of a resource in a national, state, or local register as a prerequisite to "historical" status. (*Architectural Heritage*, *supra*, 122 Cal.App.4th at p. 1114.) The Guidelines provide: "A project with an effect that may cause a substantial

35

adverse change in the significance of an historical resource is a project that may have a significant effect on the environment. [¶] (1) Substantial adverse change in the significance of an historical resource means physical demolition, destruction, relocation, or alteration of the resource or its immediate surroundings such that the significance of an historical resource would be materially impaired."[15] (Guidelines, § 15064.5, subd. (b).)

District correctly determined, and Taxpayers apparently does not dispute, that Hoover is not a historical resource itself. Rather, Taxpayers apparently argues there are historical resources near Hoover that District failed to describe and analyze, and the Project would substantially and adversely change the significance of those historical resources. The Initial Study, as quoted above, described the area surrounding the Project as "located in a built-out urban area and is surrounded by residential and commercial uses." Taxpayers apparently does not dispute the truth of that description, but rather argues District should have expanded that description to include a discussion of the neighborhood's historic characteristics. Assuming arguendo District should have included in the Initial Study a more complete description of the neighborhood surrounding Hoover, we nevertheless are unpersuaded there is substantial evidence in the record showing that neighborhood, or any element in it, is a historic resource within the

---

15     The Guidelines further provide: "The significance of an historical resource is materially impaired when a project: [¶] . . . [d]emolishes or materially alters in an adverse manner those physical characteristics of an historical resource" that convey its historical significance and justify or account for its inclusion in, or eligibility for, the California Register of Historical Resources, a local register of historical resources, or the California Register of Historical Resources as determined by a lead agency for purposes of CEQA." (Guidelines, § 15064.5, subd. (b)(2).)

36

meaning of CEQA.  Although the administrative record is voluminous, Taxpayers cites only a few pages that purportedly show there are historical resources in the neighborhood surrounding Hoover.

First, Taxpayers cites a map that apparently is an excerpt from a 1996 report of the Greater Mid-City Historic Survey Oversight Committee.  That map contains the description "Boundaries of the potential Talmadge Historic District," depicts an area adjacent to Hoover, and shows numerous lots marked with dots.  However, we do not conclude from that excerpt that the potential historic district was ever, in fact, listed by City, or determined by City to be eligible for listing in, its registry of historic districts.  The fact that an oversight committee apparently was proposing such a district does not provide substantial evidence to support a conclusion that City actually made that determination.

Second, Taxpayers cites a page in the record apparently consisting of a 2003 "draft" map created by City's planning department showing existing conditions in the Kensington-Talmadge area.  The draft map's legend and color-coding appear to show a street immediately north of Hoover (presumably Monroe Avenue) that is designated as an existing historic district.[16]  However, we are unable to conclude from that draft map that the historic district reflected on it was ever, in fact, listed by City, or determined by City to be eligible for listing, in its registry of historic districts.  The fact City's planning department created a "draft" map apparently reflecting an "existing" historic district does

_____

16      Portions of that street are designated "Talmadge Lots" and "Talmadge Gates."

37

not provide substantial evidence to support a conclusion that City actually had made that determination.

Finally, Taxpayers cites an excerpt from a "final" Mid-City Communities Plan prepared by City's planning department. That excerpt makes a general reference to "the Kensington & Talmadge Historic District." However, it does not show the location of that district or otherwise provide any substantial evidence to show the area surrounding Hoover was listed by City, or determined by City to be eligible for listing, in its registry of historic districts. Taxpayers has not carried its burden on appeal to show there is substantial evidence that the area surrounding Hoover is an historical resource within the meaning of CEQA. (Pub. Resources Code, § 21084.1; Guidelines, § 15064.5, subd. (b).)

Nevertheless, assuming arguendo there is an historical resource near Hoover, Taxpayers does not cite any substantial evidence showing that historical resource's significance may be materially impaired, and thereby substantially and adversely affected, by the Project. (Guidelines, § 15064.5, subd. (b).) Assuming Monroe Avenue adjacent to the stadium is an historical district, there is no substantial evidence showing its historical significance may be *materially* impaired by the addition of stadium field lighting. Although Taxpayers asserts the Project's lighting structures will be seen from the neighborhood during evening events and during daylight, it cannot be reasonably inferred, based on the record in this case, that the lighting may materially impair whatever historical significance Monroe Avenue or any other nearby historical resource may have. Hoover's stadium (i.e., football field, track, and bleachers) apparently has been in its current location for more than 30 years. If the Project were completed, the

38

stadium would remain, albeit renovated and with the addition of field lighting.

Taxpayers does not cite any evidence showing any special historical significance of the adjacent Monroe Avenue or other neighborhood would be materially impaired by the addition of field lighting. We cannot conclude the Project may materially impair the historical significance of ornamental lampposts and gates in the neighborhood.[17] Based on our review of the record, there is no evidence that the Project, if completed, would "[d]emolish[] or materially alter[] in an adverse manner those physical characteristics of an historical resource" that convey its historical significance and justify or account for its inclusion in, or eligibility for, the California Register of Historical Resources, a local register of historical resources, or the California Register of Historical Resources as determined by a lead agency for purposes of CEQA. (Guidelines, § 15064.5, subd. (b)(2).) We conclude there is no substantial evidence showing the Project may materially impair, or substantially and adversely affect, any historical resource. (Guidelines, § 15064.5, subd. (b).)

E

*Traffic and parking*. Taxpayers asserts a fair argument exists whether the installation of the Project's proposed field lighting for Hoover's football stadium may

---

[17] The evidence showing persons may have climbed onto gates during prior stadium events does not show the addition of field lighting may substantially impair any historical significance of those gates. Similarly, evidence showing school contractors may have damaged those gates during prior projects does not show the Project, including the addition of field lighting, may substantially impair any historical significance of those gates.

have a significant effect on the area's traffic and parking. Taxpayers also asserts District abused its discretion in adopting the MND because it did not adequately consider event attendance, traffic and parking issues.

*Initial Study*. A traffic impact study conducted by LOS Engineering, Inc. (LOS) regarding the Project's potential impact on traffic and parking is set forth in Appendix C to the Initial Study. LOS based its traffic and parking analysis on a calculation of the average attendance at evening football games, which would begin at about 6:30 p.m. Based on attendance data from five District high schools other than Hoover, LOS concluded attendance at Hoover evening football games would equal 68 percent of its student population (2,123), or 1,444. It assumed 82.5 percent of attendees (1,191) would arrive by car and each car would carry three attendees. Therefore, an average of 397 cars would travel to and from Hoover for football games. Under the Project, the number of on-site parking spaces would increase from 167 spaces to 223 spaces, an increase of 56 spaces. Because there will be only 223 on-site parking spaces for those 397 cars, the Project will create a parking shortage of 174 spaces. However, LOS concluded the Project would not have a significant impact on parking because: (1) the number of on-site parking spaces would increase by 56 spaces; (2) only 15 evening events per year would be held; and (3) noncompliance with City's parking ordinance (apparently because of a parking deficit exceeding 10 percent of the stadium's capacity) did not necessarily constitute a significant effect on the environment. Regarding the Project's impact on traffic, LOS examined existing vehicle traffic on Friday, April 24, 2009, at six intersections along El Cajon Boulevard (only two of which were adjacent to Hoover)

40

between the hours of 5:30 p.m. and 6:30 p.m.  The intersection with Highland Avenue leading to Hoover's stadium operated at a level of service of "C" based on City's criteria regarding the average number of seconds of delay.  On completion of the Project, LOS calculated that an additional 286 inbound vehicles would pass through that intersection before Hoover football games, resulting in a degradation of the level of service from "C" to "D" based on an increase in the average delay from 20.5 seconds to 33.9 seconds.  Because the level of service did not degrade below level "D" at that intersection (and the five other intersections), LOS concluded the Project did not significantly impact traffic per City's established thresholds for significance.

*Public comments*.  Following District's notice of intent to adopt the MND, it received extensive oral, written and physical evidence (e.g., photographs) from residents of Hoover's neighborhood and others regarding the environmental effects of the Project, including its anticipated impact on traffic and parking in the area.  District received comments asserting the Project would cause substantial parking and traffic problems in the neighborhood.  For example, a letter from two residents stated in part:

> "A baseline of parking has not been established at 7:00 p.m. on a Friday night (the start time for a typical evening football game) to determine how many vehicles already occupy the street parking available in the surrounding streets; thereby calculating how the overage from a night event will significantly impact the area.
>
> "There is no reference to the available off-site (street) parking in the [traffic impact study].  It only references the parking that is deficient onsite.
>
> "The area is landlocked by canyons.  This leaves no other option for residents and event attendees alike, when parking is not available, to

41

park completely out of the area and/or illegally parking their vehicle[s] (which is usually a common choice). [¶] . . . [¶]

"Due to the number and size of event attendee vehicles parked along our narrow streets (streets which are less than 30 feet across)[,] visibility from cross streets is significantly impacted which promotes an unsafe driving situation. Many of these parked cars are illegally blocking driveways, crosswalks, and access to fire hydrants. Due to the illegal parking on the narrow streets, residents do not have the space required to maneuver their vehicles from the street to their driveways/garages."

*District's response*. In response to the public comments it received, District stated the Guidelines did not require it to perform a CEQA analysis of the Project's impact on parking. Furthermore, District stated that because the capacity of the stadium's bleachers would be reduced by 1,665 seats, it did not expect the Project to cause any expansion of event attendance. Regarding traffic, District stated it would implement traffic control and crowd control measures during evening events to direct traffic, prevent loitering in the neighborhood, and encourage parking on the Hoover campus.

*Attendance*. Taxpayers argues District abused its discretion by not establishing a baseline attendance number for Hoover football games and by assuming 1,444 persons would attend football games on completion of the Project. An initial study under CEQA must describe the physical environmental conditions in the vicinity of a proposed project as they exist at that time, which environmental setting will normally constitute the baseline physical conditions by which a lead agency will determine whether a project may have a significant impact on the environment. (Guidelines, §§ 15125, subd. (a), 15126.2, subd. (a); *Communities*, *supra*, 48 Cal.4th at p. 320 & fn. 5.) Without a comparison of existing, baseline physical conditions to the conditions expected to be

42

produced by a project, an initial study or EIR "will not inform decision makers and the public of the project's significant environmental impacts, as CEQA mandates." (*Communities*, at p. 328.) Nevertheless, neither CEQA nor the Guidelines "mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review . . . for support by substantial evidence." (*Ibid.*)

The Initial Study, including the traffic impact study, did not include *any* calculation or other description of *existing* attendance at Hoover football games. To the extent District asserts that calculation was not required by CEQA because Hoover's football games currently are held in the afternoon, the record appears to reflect a virtual consensus among Hoover staff, parents, and alumni, neighborhood residents, and others that the addition of stadium lighting would allow more persons (e.g., parents) to attend football games during evening hours when most persons are not working and thus increase attendance at Hoover football games.[18] Accordingly, District *should* have considered such afternoon game attendance in calculating a baseline attendance figure so

---

[18]     Ron Lardizabal, Hoover's athletic director, described at the January 11, 2011, Board meeting how adult attendance at Hoover football games was greater at three evening football games held in 2006, 2008, and 2010 (apparently using temporary field lighting) than at games held in the afternoon.

it could compare that baseline to expected attendance at evening football games on completion of the Project.[19]

In any event, District's calculation of the expected attendance at Hoover's evening football games on completion of the Project was questionable. Rather than using actual attendance data for Hoover's afternoon football games and increasing that number to account for additional persons who would attend evening games, LOS, on District's behalf, based its calculation on the average attendance at football games at five of District's 16 high schools (excluding Hoover) without providing any explanation regarding why those schools were selected and/or were comparable to Hoover. Those five high schools were La Jolla, Lincoln, Madison, Mira Mesa, and San Diego high schools. Even were we to assume those high schools were selected because they have stadium lighting and hold evening football games, LOS did not explain why attendance data from the three other District high schools that also have stadium lighting (i.e., Patrick Henry, Scripps Ranch, and Serra high schools) were excluded from its study.[20] In the circumstances of this case, absent a reasonable explanation for exclusion, it would appear to be a better practice to consider attendance data from all eight District schools

[19]    To the extent LOS implicitly applied a baseline attendance number of zero because Hoover does not currently hold evening football games, we nevertheless believe Hoover's afternoon game attendance data has an important role in calculating its expected evening game attendance on completion of the Project.

[20]    A June 17, 2009, memorandum from Dave Davis, District's CEQA coordinator, set forth an informational matrix listing those District high schools that have football field lighting and those that do not.

44

that hold evening football games in calculating the expected attendance at Hoover evening football games were the Project completed.

For each of the five high schools, LOS calculated a ratio of its average attendance at evening football games to its number of enrolled students. However, LOS does not explain how that ratio is helpful in calculating the expected attendance at Hoover's evening football games. Nevertheless, assuming there is some general correlation between enrollment at high schools and average attendance at football games, we likely would defer to District in its selection of a methodology for calculating the expected attendance at Hoover evening football games. (Cf. *Communities*, *supra*, 48 Cal.4th at p. 328 [lead agencies have discretion to choose methodology for determining existing conditions baseline if supported by substantial evidence].) Based on its data, LOS found there was a range of 125 percent (at Lincoln High School) to 13 percent (at San Diego High School) at those five high schools. For those five high schools, the average percentage of attendance at football games to student enrollment was 68 percent.[21] Applying that percentage to Hoover's student enrollment of 2,123, LOS calculated the attendance at Hoover's evening football games on completion of the Project would be 1,444. However, LOS did not compare that number to actual attendance data from

_____

[21]    As Taxpayers argues, absent a reasonable explanation showing Hoover's football game circumstances are similar to San Diego High School's, a statistician might exclude that school's low 13 percent attendance rate as aberrational, thereby increasing the average percentage for the other four high schools (or seven if the three excluded high schools were included) above 68 percent (e.g., to 82 percent). In that event, LOS's methodology would result in a greater expected attendance at Hoover evening football games (e.g., 82 percent of 2,123 enrolled students, or 1,740).

Hoover's past afternoon football games to verify whether that number of attendees (i.e., 1,444) appeared realistic considering the general consensus that attendance would increase at Hoover football games were they held in the evening with field lighting. Absent that check based on actual Hoover attendance data, it may be questioned whether LOS's methodology, as applied, resulted in an abuse of discretion and/or was not supported by substantial evidence. Without a reasonable determination of the expected attendance at Hoover evening football games on completion of the Project, District may be unable to adequately compare the baseline attendance to expected attendance in determining whether there is a fair argument the Project may have a significant impact on traffic and/or parking.[22] (Guidelines, §§ 15125, subd. (a), 15126.2, subd. (a); *Communities*, at p. 320 & fn. 5.)

*Parking*. Taxpayers asserts that District did not conduct an adequate study of the Project's impact on parking. The Initial Study stated the Project will create a parking shortage of 174 spaces. However, based on our review of LOS's study, it appears LOS did *not* make any attempt to ascertain the *total* number of off-site, street parking spaces in the immediate area, nor did LOS make any attempt to ascertain the number of *available* off-site, street parking spaces during the Friday evening time period of 5:30 p.m. to 6:30

---

[22]    We further believe District's study of the Project's impact on traffic and parking should consider both the *average* expected attendance at Hoover evening football games and the expected *peak* attendance at evening football games (e.g., homecoming games). However, contrary to Taxpayers's assertion, District's attendance calculation was not required to be equal to the stadium's full *capacity* on completion of the Project (i.e., 2,796), but rather should be based on the *expected attendance* at football games on completion of the Project.

46

p.m. that it selected for determining traffic levels. Therefore, LOS had *no basis* on which to conclude the parking shortage of 174 spaces would be filled by available off-site, street parking spaces in the immediate area. Contrary to LOS's conclusion, the fact the Project would add 56 on-site spaces did not show the Project could not have a significant impact on parking in the neighborhood based on the apparent need of 174 off-site, street parking spaces.[23]

Contrary to District's assertion, CEQA does not provide that a project's direct impact on parking cannot constitute a significant impact on the physical environment. In support of its assertion, District cites language from *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656 (*SFUDP*), which states:

> "[T]here is no statutory or case authority requiring an EIR to identify specific measures to provide additional parking spaces in order to meet an anticipated shortfall in parking availability. The social inconvenience of having to hunt for scarce parking spaces is not an environmental impact; the secondary effect of scarce parking on traffic and air quality *is*. Under CEQA, a project's social impacts need not be treated as significant impacts on the environment. An EIR need only address the *secondary physical* impacts that could be triggered by a social impact. (Guidelines, § 15131, subd. (a).)

---

[23] Furthermore, had an adequate expected attendance determination been made, it is likely a much greater number of off-site, street parking spaces would be required for Hoover evening football games. For example, if expected attendance were 1,740, using LOS's methodology about 478 vehicle trips would be made in and out of the area for Hoover football games and, after subtracting the number of on-site spaces (223), there would be a parking shortage of 255 spaces instead of the 174 spaces calculated by LOS in its traffic and parking study, resulting in a much greater impact on parking in the area.

"Thus, the EIR correctly concluded that '[p]arking shortfalls relative to demand are not considered significant environmental impacts in the urban context of San Francisco. Parking deficits are an inconvenience to drivers, but not a significant *physical* impact *on the environment*.' (Italics added.) The EIR then fulfilled its CEQA-mandated purpose by identifying ways in which the secondary *environmental* impacts resulting from the projected parking deficits could be mitigated, in keeping with the specific environmental strictures imposed by the City's own transit-first policy." (*SFUDP*, at p. 697.)

District argues that under *SFUDP* the parking shortage created by the Project is merely a "social inconvenience," and cannot constitute a significant physical impact on the environment. However, as Taxpayers argues, that language from *SFUDP* is likely dicta because the court alternatively concluded there was substantial evidence to support the EIR's conclusion that proposed measures to mitigate the parking shortage were adequate. (*Id*. at pp. 696-698 & fn. 24.) Furthermore, *SFUDP*'s language applied only to the special circumstances in that case in which there was a strong public policy, reflected in a city ordinance, against providing private off-street parking to encourage the use of public transit.[24] (*SFUDP, supra,* 102 Cal.App.4th at pp. 696-698 & fn. 24.) In any event, we

---

[24] *SFUDP* stated: "Significantly, the City Planning Code itself does not require new commercial projects in the downtown commercial retail district to provide additional off-street parking. Thus, Planning Code section 161 states in pertinent part as follows: '(c) In recognition of the compact and congested nature of the downtown area . . . , the accessibility of this area by public transit, and programs for provision of public parking facilities on an organized basis at specific locations, no off-street parking shall be required for any use, other than dwellings where a requirement is specified, in any C-3 . . . Commercial Districts.' " (*SFUPD*, *supra*, 102 Cal.App.4th at p. 698, fn. 24.) Unlike the circumstances in *SFUPD*, the Project in this case is not located in a downtown area, and there is no City ordinance absolving a project from providing off-street parking. On the contrary, City apparently has an ordinance generally requiring projects to provide off-street parking as LOS noted in its traffic impact study.

48

disagree with the broad statement made in *SFUPD* that a parking shortage is merely a social inconvenience and can never constitute a primary physical impact on the environment. As Taxpayers notes, cars and other vehicles are physical objects that occupy space when driven and when parked. Therefore, whenever vehicles are driven or parked, they naturally must have some impact on the physical environment. The fact that a vehicle's impact may be only temporary (e.g., only so long as the vehicle remains parked) does not preclude it from having a physical impact on the environment around it. Therefore, as a general rule, we believe CEQA considers a project's impact on parking of vehicles to be a physical impact that could constitute a significant effect on the environment.

Although the Guidelines apparently do not specifically list parking as one of the potential impacts that must be addressed in an initial study or EIR, the Guidelines do not set forth an exclusive list of all potential impacts that must be addressed.[25] Rather, they provide a sample list of those impacts of projects that are most common and should be addressed by lead agencies. (See, e.g., Guidelines, append. G.) The Guidelines expressly advise: "Substantial evidence of potential impacts that are not listed on this form must also be considered." (Guidelines, append. G.) Furthermore, the Guidelines include a

---

[25] In fact, a former version of the Guidelines apparently expressly listed parking as a potential significant environmental impact. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 798 ["Chamber of Commerce urges that an 'adverse parking effect' is itself an environmental impact, citing Guidelines, appendix G, [former section XVI, subdivision (f)] (which is simply a sample question that asks: 'Would the project result in inadequate parking capacity?')"].)

section on transportation and traffic, which issues presumably include parking issues even though parking is not expressly listed. (Guidelines, append. G, § XVI.) We reject *SFUDP*'s language, quoted above, and are unpersuaded by its reasoning. Therefore, we decline to apply it in the circumstances of this case.[26]

Furthermore, regardless of whether parking is considered a primary or secondary impact of a project, a project's impact on parking generally should be studied for any potential impact on the environment. "CEQA requires a governmental agency [to] prepare an environmental impact report (EIR) whenever it considers approval of a proposed project that '*may* have a *significant* effect on the environment.' ([Pub. Resources Code,] § 21100, italics added.)" (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas*, *supra*, 29 Cal.App.4th at p. 1601.) CEQA does not limit consideration of a project's effects on the environment to only those that are "direct" or "primary." The Guidelines define "[s]ignificant effect on the environment" as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area

---

[26] Apparently other courts have not adopted *SFUPD*'s language. Our research has not found any published California case adopting that language and applying it to exclude parking as a potential environmental effect under CEQA. We also note that it is not uncommon for initial studies and EIR's to include sections analyzing the potential impacts of projects on traffic and *parking*, reflecting a presumption that the lack of sufficient parking can constitute a significant impact on the environment. (See, e.g., *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 418 [EIR's parking mitigation measures were adequate]; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 916-918 [substantial evidence supported EIR's finding that project would not have a significant impact on parking]; *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1019-1022, 1029-1030 [EIR's parking mitigation measures were adequate].)

50

affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance.  An economic or social change *by itself* shall not be considered a significant effect on the environment.  *A social or economic change related to a physical change may be considered in determining whether the physical change is significant*."  (Guidelines, § 15382, italics added.)  If a project causes a direct or indirect adverse change in a physical condition in an area, any social impact on humans related to that physical change may be considered by a lead agency in determining whether the physical change is "significant" under CEQA.  (Guidelines, §§ 15360 [significant effects may be either direct or indirect], 15064, subd. (e) ["If the physical change causes adverse economic or social effects on people, those adverse effects may be used as a factor in determining whether the physical change is significant."]; see also Pub. Resources Code, § 21065 [defining a "project" as an activity that may cause "either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment"].)  The Guidelines define the "environment" as "the physical conditions which exist within the area which will be affected by a proposed project . . . [and] includes both natural and man-made conditions." (Guidelines, § 15360; see Pub. Resources Code, § 21060.5.)

Vehicles, whether driven or parked, in effect constitute man-made conditions and therefore may constitute physical conditions in an area that may be affected by a proposed project, thereby requiring a lead agency to study whether a project's impact on parking may cause a significant effect on parking and thus the environment. Furthermore, to the extent the lack of parking affects humans, that factor may be

51

considered in determining whether the project's effect on parking is significant under CEQA. (Cf. Guidelines, § 15064, subd. (e) [overcrowding of a public facility that causes an adverse effect on people may be regarded as a significant effect].)

Based on our review of the record in this case, District did not properly study the question of whether the Project may have a significant effect on parking in the area. Initially, it did not properly establish a baseline attendance number to which it could compare the expected attendance on completion of the Project, which comparison would ultimately allow it to consider the nature and scope of the Project's adverse change on parking in the area. The record includes extensive evidence (e.g., letters and photographs) from residents in the area showing the Project may have an adverse effect on parking. The personal observations and opinions of local residents on the issue of parking in the area may constitute substantial evidence that a project may have a significant impact on parking and thus the environment. (Cf. *Mejia*, *supra*, 130 Cal.App.4th at p. 339; *Architectural Heritage*, *supra*, 122 Cal.App.4th at pp. 1117-1118; *Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333, 1347.)

Based on our review of the record, we conclude there is substantial evidence to support a fair argument that the Project may have a significant impact on parking and thus the environment. In addition to the comment letter quoted above, a Monroe Avenue resident wrote a letter expressing his opposition to Hoover's stadium lighting and night football games because, in part, "[s]chool parking is inadequate and so spill over into the bedroom community behind the school is planned for the school to have a major influx of

52

cars and people" and "[s]treet parking in all the closed canyon streets as well as Monroe Ave & Max Drive behind the school is filled during daylight games and will impair the bedroom community in evening hours in ways of preventing parking for people that live in the area coming home from work."[27] Many other residents wrote letters expressing their concerns that the Project would adversely affect the availability of street parking in the area. Contrary to District's assertion, the "limited" number of evening events at Hoover's stadium on completion of the Project (i.e., 15 to 19 evening events per year) will not necessarily reduce those parking problems below a level of significance.[28]

---

[27]    To the extent District asserts any parking problems on neighborhood streets (e.g., Highland Avenue and Monroe Avenue) will be avoided by restricting access to the stadium and allowing access only from El Cajon Boulevard, its supporting citation does not show the Project will so restrict access. Also, although the Initial Study noted "[a]ccess to the football field would only be available from the internal portion of the school campus through the eastern portion of the football field at the new athletic services building," it is unclear whether that statement means that all current gates to and from Highland Avenue and/or Monroe Avenue would be closed or whether those gates would remain open but football game attendees would be required to enter the stadium or football field through one internal gate on the east side of the field. The record contains a January 2009 document presumably prepared by District staff indicating that Hoover plans to have separate home and visitor entrance gates for the stadium. That document tends to refute District's apparent assertion on appeal that there will be only one internal gate that could be accessed only from El Cajon Boulevard on the south side of the Hoover campus. Nevertheless, to the extent attendees *are* required to enter only from El Cajon Boulevard, the traffic and parking issues should be addressed considering that restriction.

[28]    We acknowledge that, on its face, there appears to be an inconsistency between this statement and our conclusion above that the limited number of events is one factor showing the Project's lighting impact would not be significant. Because we considered other factors along with the limited number of evening events in concluding the Project's lighting would not have a significant effect on the environment, the number of events was only one factor that weighed in favor of that conclusion. Furthermore, the Project's impact on parking and lighting appears to be substantially different, both qualitatively

53

Furthermore, because District did not have sufficient information relating to the Project's impact on parking and therefore could not adequately consider the potential significance of the Project's impact on parking, District abused its discretion as a decision maker under CEQA. (Pub. Resources Code, § 21168.5 [agency abuses its discretion under CEQA if it does not proceed in a manner required by law]; *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council* (2010) 190 Cal.App.4th 1351, 1385-1388; *Sierra Club*, *supra*, 6 Cal.App.4th at p. 1317.) Because there is substantial evidence to support a fair argument that the Project may have a significant effect on parking, an EIR is required for the Project. (*Mejia*, *supra*, 130 Cal.App.4th at p. 342.) The trial court erred by concluding otherwise.

*Traffic*. We further conclude there is substantial evidence to support a fair argument that the Project may have a significant effect on traffic in the area. Many of the residents' comment letters referred to the significant traffic problems they observed during past events at the stadium and complained their neighborhood's narrow streets became very congested during stadium events. Residents described vehicles crossing over the center lines of streets into oncoming traffic, vehicles striking and breaking side mirrors of parked cars, and dangerously reduced visibility at street intersections because of parked vehicles. Based on the general consensus that evening football games on completion of the Project will increase attendance and thus the number of vehicles, any

and quantitatively. The record shows a much greater number of area residents likely will be adversely affected by the parking shortage caused by the Project than will be adversely affected by the Project's lighting.

54

traffic problems experienced in the past logically will only be exacerbated if the Project is completed and evening football games are held. Furthermore, as discussed above, District's lack of sufficient attendance data precluded it from adequately addressing traffic problems (as well as parking problems) that may be caused by the Project. Had District obtained sufficient data on which to make a proper estimate of expected attendees, it may very well have determined that the number of vehicles expected to travel in and out of the Hoover neighborhood during evening football games will be much greater than the 397 vehicles LOS calculated in its traffic impact study. Finally, because District did not have sufficient information relating to the Project's impact on traffic and therefore could not adequately consider the potential significance of the Project's impact on traffic, District abused its discretion as a decision maker under CEQA.[29] (Pub. Resources Code, § 21168.5 [agency abuses its discretion under CEQA if it does not proceed in a manner required by law]; *Sunnyvale West Neighborhood Assn. v. City of Sunnyvale City Council*, *supra*, 190 Cal.App.4th at pp. 1385-1388.) Because there is substantial evidence to support a fair argument that the Project may have a significant effect on traffic (as well as on parking, as discussed above), an EIR is required

---

[29]     LOS's traffic impact study did not appear to consider any traffic congestion, and the resulting dangers, on the neighborhood's narrow streets and intersections, particularly considering the many parked cars, were the Project completed. Rather, LOS appeared to consider only the actual number of vehicles at certain intersections along El Cajon Boulevard (e.g., vehicles turning from El Cajon Boulevard onto Highland Avenue), which arguably is an inadequate analysis of traffic impacts potentially caused by the Project.

for the Project. (*Mejia*, *supra*, 130 Cal.App.4th at p. 342.) The trial court erred by concluding otherwise.[30]

F

*Zoning*. Taxpayers asserts District wrongly claimed in the Initial Study that the Project was exempt from City's zoning and land use laws and therefore no discussion or consideration of the Project's inconsistency with those laws was required. As noted above, the Board did not act to exempt the Project from City's zoning and land use laws until May 10, 2011. Therefore, the Initial Study's claim on January 11, 2011, that the Project was exempt from City's zoning and land use laws was not correct. However, because the Board subsequently acted to exempt the Project and because we reverse and remand this matter for preparation of an EIR for the Project, this issue is moot and we need not address it further.

G

Because there is substantial evidence to support a fair argument that the Project may have a significant effect on traffic and parking, the trial court erred by concluding District properly adopted the MND and Initial Study and by dismissing Taxpayers's second cause of action for violation of CEQA.

---

[30]    Because we reverse the trial court's dismissal of the second cause of action based on substantial evidence that the Project may have a significant effect on traffic and parking, we need not address Taxpayers's additional contention that the Project's cumulative impacts are significant.

## III

### *Government Code Section 53094 Exemption*

Taxpayers contends the trial court erred by dismissing its third and fourth causes of action because District's resolution pursuant to Government Code section 53094 exempting Hoover and other high schools from City's zoning and land use laws is invalid. It argues inadequate notice of that action was given, the exemption of classroom and nonclassroom facilities is overbroad, and that exemption action is a project requiring compliance with CEQA.

### A

Taxpayers's first amended complaint alleged causes of action for District's violation of the City's zoning and land use laws (third cause of action) and for District's violation of Government Code section 53094 by exempting the Hoover Project and certain other high school projects from City's zoning and land use laws (fourth cause of action). Taxpayers argued it should prevail on its third cause of action because the Board did not adopt a resolution to exempt the challenged high school projects from zoning and other land use laws until May 10, 2011, *after* Taxpayers filed the instant action on February 9, 2011. Taxpayers also argued Hoover's new stadium lighting was part of nonclassroom facilities that cannot be exempted from zoning and other land use laws under Government Code section 53094. In its fourth cause of action, Taxpayers argued reasonable notice was not given to affected property owners of the Board's hearing on the resolution to exempt District from City's zoning and other land use laws. It also argued District improperly exempted whole school sites under Government Code section 53094.

57

Finally, it argued District's Government Code section 53094 exemption action was a project within the meaning of CEQA, thereby triggering District's duty to conduct a proper CEQA review before taking that action.

District refuted Taxpayers's arguments and argued the third and fourth causes of action should be dismissed. After reviewing the parties' papers and hearing arguments of counsel, the trial court rejected Taxpayers's arguments and dismissed the third and fourth causes of action.

B

In construing statutory language, we attempt to ascertain and effectuate the Legislature's intent. (*People v. Casteneda* (2000) 23 Cal.4th 743, 746-747.) "We begin by examining the words of the [statute]; if the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs. [Citations.] If, however, the statutory language lacks clarity, we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such situations, we strive to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statute['s] general purposes. [Citation.] We will avoid any interpretation that would lead to absurd consequences." (*People v. Walker* (2002) 29 Cal.4th 577, 581.) On appeal, we review de novo, or independently, the question of law regarding the proper interpretation of a statute. (*Lazar v. Hertz Corp.*, *supra*, 69 Cal.App.4th at p. 1502.)

C

Government Code section 53094 provides in pertinent part:

58

"(b) [T]he *governing board of a school district*, that has complied with [certain statutory prerequisites not relevant in this case], by a vote of two-thirds of its members, *may render a city or county zoning ordinance inapplicable to a proposed use of a property* by the school district. The governing board of the school district may *not* take this action when the proposed use of the property by the school district is *for nonclassroom facilities*, including, but not limited to, warehouses, administrative buildings, and automotive storage and repair buildings.

"(c) The governing board of the school district shall, within 10 days, notify the city or county concerned of any action taken pursuant to subdivision (b). . . ." (Italics added.)

After discussing the legislative history of Government Code section 53094 and its amendments, one court concluded:

"[T]he amendments to [Government Code] section 53094 do suggest a legislative conclusion that the relationship between school boards and their 'nonclassroom facilities' is not significantly different from the relationship between other state agencies and their property, which, in fact, could also be characterized as 'nonclassroom facilities,' and therefore, state educational policy does not reasonably or logically justify continued permission for school boards to exempt their 'nonclassroom facilities' from local control. As to what 'nonclassroom facilities' are, the legislative genealogy of [Government Code] section 53094 further suggests that 'nonclassroom facilities' are those that are not by their nature so directly or sufficiently related to a school board's unique function as to distinguish it from any other local agency.

"The statute itself confirms and helps clarify this suggestion by enumerating instructive examples of 'nonclassroom facilities.' The statute lists 'warehouses, administrative buildings, [and] automotive storage and repair buildings[.]' These facilities have nothing directly to do with *classroom* activities. Rather, they are devoted completely to ancillary, noninstructional functions. Thus, we perceive in [Government Code] section 53094 an intention to distinguish between instructional and support facilities. Accordingly, we consider it reasonable and consistent with the legislative history and purpose of [Government Code] section 53094 to interpret 'nonclassroom facilities' to mean those not directly used for or

59

related to student instruction." (*City of Santa Cruz v. Santa Cruz City School Bd. of Education* (1989) 210 Cal.App.3d 1, 7 (*Santa Cruz*).)

D

Taxpayers initially asserts the trial court erred by dismissing its third and fourth causes of action because District did not give adjacent property owners reasonable notice and an opportunity to be heard on the Board's proposed action to exempt District's 12 high school projects from City's zoning and land use laws. Taxpayers argues the four days' notice provided by District on May 6, 2011, by posting the Board's agenda on its website and at District's office was inadequate notice. Taxpayers argues the Board's action exempting the 12 high school projects from City's zoning and land use laws constituted a quasi-adjudicative action, triggering greater notice requirements.

However, none of the cases cited by Taxpayers persuade us the Board's exemption action required any greater notice than required for any general business action. In *Horn v. County of Ventura* (1979) 24 Cal.3d 605, cited by Taxpayers, the court stated: "Due process principles require reasonable notice and opportunity to be heard before governmental deprivation of a significant property interest. [Citations.] [¶] It is equally well settled, however, that only those governmental decisions which are *adjudicative* in nature are subject to procedural due process principles. *Legislative* action is not burdened by such requirements." (*Id*. at p. 612.) *Horn* further stated: "Subdivision approvals, like variances and conditional use permits, involve the application of general standards to specific parcels of real property. Such governmental conduct, affecting the relatively few, is 'determined by facts peculiar to the individual case' and is 'adjudicatory' in

60

nature." (*Id.* at p. 614.) Accordingly, *Horn* concluded: "[W]henever approval of a tentative subdivision map will constitute a substantial or significant deprivation of the property rights of other landowners, the affected persons are entitled to a reasonable notice and an opportunity to be heard before the approval occurs." (*Id.* at p. 616.) We conclude *Horn* is factually inapposite to this case and does not persuade us Taxpayers or its members were entitled to reasonable notice and an opportunity to be heard under due process standards.

Assuming arguendo the Board's proposed action to exempt Hoover and the other 11 high schools from City's zoning and land use laws was, as Taxpayers argues, quasi-adjudicative in nature, the record in this case does not show, and Taxpayers's first amended complaint did not allege, the Board's proposed action would deprive Taxpayers or its members of any "significant" property interest. Taxpayers alleged Hoover's proposed new stadium lighting would exceed City's 30-foot limit for structures for the applicable residential zone. However, we cannot conclude Taxpayers or any of its members residing near Hoover would suffer a *significant* deprivation of a property interest were the new stadium lights installed. Taxpayers has not cited any evidence in the record that would support a reasonable inference the new stadium lighting would so substantially affect the use of neighboring property that it could constitute a significant deprivation of a property interest under constitutional due process standards. On the contrary, the appearance of tall light standards, along with occasional evening events involving some light trespass and additional traffic, could not, as a matter of law, result in a significant deprivation of a property interest in the circumstances of this case. *Horn*

does not persuade us District was required to provide neighboring property owners with reasonable notice and an opportunity to be heard on the Board's proposed exemption action.

Neither *Scott v. City of Indian Wells* (1972) 6 Cal.3d 541 nor *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, cited by Taxpayers, are apposite to this case or persuade us to reach a contrary conclusion. In *Scott*, the court concluded the City of Indian Wells was required to give notice to any nonresident owners of property just outside city limits of a proposed grant of a conditional use permit for construction of an adjacent large planned development within city limits. (*Scott,* at pp. 544, 548-549.) The court reasoned: "Certainly it is clear that the development of a parcel on the city's edge will substantially affect the value and usability of an adjacent parcel on the other side of the municipal line." (*Id*. at p. 548.) In *Topanga*, the court reversed a county's grant of a zoning variance that allowed the development of a mobile home park on 28 acres, concluding, in part, that the zoning variance was a quasi-judicial, administrative action that required supporting evidence and findings. (*Topanga*, at pp. 509-510, 516-517.) None of Taxpayers's cited cases support its argument that "surely an action to exempt one or more aspects of a school's 'classroom facilities' from zoning ordinances cannot be so minor as to dispense with notice and due process to adjacent land owners." We conclude Taxpayers has not carried its burden on appeal to persuade us District was required to provide it and its members with reasonable notice and an

62

opportunity to be heard before the Board adopted the resolution exempting the projects at Hoover and 11 other high schools from City's zoning and land use laws.[31]

E

Taxpayers also asserts the Board's resolution exempting the 12 high schools from City's zoning and land use laws was overbroad. It argues the resolution did not specify which facilities at each high school were exempted and from which specific zoning laws were they exempted.

*The Board's resolution.* On May 10, 2011, the Board considered a resolution that included the following prefatory recitals:

> "**WHEREAS**, [District] currently uses the facilities at certain comprehensive High School Sites ('School Sites') for educational purposes (the location of the School Sites is attached hereto as Exhibit 'A');
>
> "**WHEREAS**, District proposes to modernize and construct new facilities ('Projects') at their School Sites;
>
> "**WHEREAS**, the Projects are for educational facilities as required by Government [Code] Section 53094 and is subject to design review by the Division of the State Architect ('DSA') under Education Code section 17280 et seq.;

---

[31] We further note there is no language in Government Code section 53094 or its related provisions requiring any particular notice and opportunity to be heard be given to owners of adjacent property before a school district's board adopts a resolution exempting a proposed use of district property from applicable zoning ordinances. To the extent Taxpayers believes such notice should be required, it is within the province of the Legislature, not the courts, to enact legislation requiring notice and an opportunity to be heard. Absent such legislation, reasonable notice and an opportunity to be heard will be required only when the proposed action will result in a significant deprivation of a property interest as discussed above.

63

"**WHEREAS**, Government Code section 53094 authorizes District, by a vote of two-thirds of its members, to render city zoning ordinances inapplicable to the Projects and School Sites when the District's use is for educational facilities;

"**WHEREAS**, School Sites are located within the boundaries of [City]; and

"**WHEREAS**, District has balanced the interests of the public, including those of District and those of [City] and determined that the interests of the public are best served by commencing and completing the Projects upon the School Sites under DSA review."

The Board then unanimously adopted the following resolutions:

"Section 1.  That all the above recitals are correct.

"Section 2.  That [District] hereby renders inapplicable any zoning ordinances of [City] including, without limitation, the City's Zoning Ordinances and General Plans, which would otherwise be applicable to the Projects or the School Sites.

"Section 3.  That the Superintendent of [District], or his designee, is further directed to give written notice to the City as required by Government Code Section 53094 within ten (10) days of this action."

Exhibit A attached to the resolution set forth the names and addresses of Hoover and 11 other District high school projects.[32]  On May 12, 2011, District gave City written notice of the Board's exemption action under Government Code section 53094.

---

[32]     Hoover's project was described as "Hoover High School Stadium and Sports Facility Improvements."  Nine of the other 11 high school projects contained similar project descriptions for stadium and/or sports facility improvements.  The two remaining high school projects were described as "Whole Site Modernization" for La Jolla High School and Serra High School.  Given the timing of the Board's resolution and the context of this case, those projects presumably refer to the projects listed for each high school site in Proposition S.

Taxpayers argues the Board's exemption action was overbroad because it referred to, and exempted, "educational facilities" rather than "classroom facilities," as used in Government Code section 53094. That statute authorizes a school district board to exempt from zoning ordinances a proposed use of district property, except when the proposed use is for "nonclassroom facilities." (Gov. Code, § 53094, subd. (b).) In *Santa Cruz*, the court considered the question of what proposed property uses qualify for zoning law exemption under Government Code section 53094 and what uses do not. It interpreted "nonclassroom facilities" under Government Code section 53094 as meaning "those not directly used for or related to student instruction." (*Santa Cruz*, *supra*, 210 Cal.App.3d at p. 7.) Therefore, school district property directly used for or related to student instruction qualifies for zoning law exemption under that statute. (*Id*. at pp. 7-8.) In that case, the school district exempted from city zoning laws the school district's project to replace a high school stadium's lighting using higher, aluminum poles in place of shorter, wooden poles. (*Id*. at pp. 3-4.) *Santa Cruz* concluded there was sufficient evidence to support a finding the stadium's field "serves an important educational purpose at [the high school] and is directly used for student instruction." (*Id*. at p. 8.) Furthermore, although evening athletic competitions in a different context may be considered "extracurricular activities," *Santa Cruz* noted the California Supreme Court had concluded they "are an integral and vital part of an educational program and that they are 'educational' within the free education guaranteed by the California Constitution." (*Id*. at pp. 8-9.) Based on that reasoning, we conclude the distinction between classroom facilities and nonclassroom facilities under Government Code section 53094 turns on

65

whether the proposed use of the facilities is directly for or related to *educational* purposes (i.e., the property is "directly used for or related to student instruction"). (*Santa Cruz*, at p. 7.)

In this case, the recitations to the Board's exemption resolution expressly stated: "[T]he Projects are for educational facilities as required by Government [Code] Section 53094." By inclusion of that descriptive language, the Board's resolution, when read as a whole, exempted only those listed District projects or properties used as educational facilities and therefore implicitly excluded from exemption those projects or properties used as noneducational facilities. Because under *Santa Cruz* educational facilities and classroom facilities have the same meaning for purposes of Government Code section 53094, we conclude the Board's exemption resolution was not overbroad in exempting from City's zoning laws those projects at the 12 high schools to the extent they were for educational (i.e., classroom) purposes. We agree with, and adopt, *Santa Cruz*'s holding that, absent extraordinary circumstances, high school athletic stadium lighting is directly used for or related to the educational purposes of the high school and therefore should be considered part of classroom facilities that may be exempted from zoning laws pursuant to Government Code section 53094. (*Santa Cruz*, *supra*, 210 Cal.App.3d at pp. 7-9.) The Board's resolution properly exempted Hoover's new stadium lighting from City's zoning and land use laws.

Furthermore, to the extent certain language in the Board's resolution could be interpreted as exempting nonclassroom facilities, our interpretation of that language considering the entire resolution limits the Board's zoning law exemption to only those

66

projects or properties directly used for or related to educational, or classroom, purposes. The Board's resolution stated it made inapplicable those City's zoning laws and general plans that "would otherwise be applicable to the Projects or the School Sites." Although it may be possible to interpret that language, in isolation, as exempting all aspects of the Proposition S projects at the 12 listed high schools, whether for educational uses or not (or even as applying to all educational and noneducational facilities at the 12 high schools), we conclude that when that language is read in the context of the entire resolution, the Board's resolution exempts from City's zoning laws only those parts of the projects or properties at the 12 high schools directly used for or related to educational, or classroom, purposes within the meaning of Government Code section 53094.[33] Contrary to Taxpayers's assertion, the Board was not required to itemize each and every aspect of the high school projects that will be directly used for or related to educational, or classroom, purposes. Taxpayers concedes it has not found any case addressing the sufficiency of the description of the project, classroom facility, and zoning laws for purposes of an exemption action under Government Code section 53094.[34] Because we construe the Board's resolution as exempting only those projects directly used for or related to educational, or classroom, purposes, we need not decide what specific

---

[33] Of course, had the Board's resolution been written using more precise language, any ambiguity could have been avoided and its construction would have been self-evident.

[34] *City of Stockton v. Marina Towers, LLC* (2009) 171 Cal.App.4th 93, cited by Taxpayers, is inapposite to this case, does not involve Government Code section 53094, and therefore does not persuade us to reach a contrary conclusion.

67

descriptions may required for exemption in other cases under Government Code section 53094. The Board did not act arbitrarily or capriciously by adopting the resolution exempting the 12 high school projects from City's zoning ordinances and general plans.

F

Taxpayers also asserts the Board's zoning exemption action was a "project" within the meaning of CEQA and therefore required District to comply with CEQA before the Board took that action.

A government agency does not have a duty to comply with CEQA unless its actions will constitute "approv[al]" of a "project." (*Lexington Hills Assn. v. State of California* (1988) 200 Cal.App.3d 415, 430.) Public Resources Code section 21065 defines a "project" under CEQA as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." The Guidelines define "approval" for public agency projects as "the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (Guidelines, § 15352, subd. (a).) "An activity that is not a 'project' as defined in the Public Resources Code (see [Pub. Resources Code,] § 21065) and the Guidelines (see [Guidelines] § 15378) is not subject to CEQA." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380.) The Guidelines state: "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).) "Whether an activity constitutes a project

68

under CEQA is a question of law that can be decided de novo based on the undisputed evidence in the record." (*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1412-1413.)

The Board's zoning exemption resolution was neither an "approval" nor a "project" under CEQA. First, it was not an "approval" because the resolution did not commit District to "a definite course of action in regard to a project." (Guidelines, § 15352, subd. (a).) Rather, the resolution referred to 12 proposed high school projects and exempted them from City's zoning and land use laws. By exempting those proposed projects from City's zoning and land use laws, the Board *did not commit* District to a *definite* course of action regarding any of the those projects. Instead, the exemption resolution was merely one prerequisite to completion of the proposed projects should District take affirmative action actually committing itself to a definite course of action regarding any or all of those projects. By adopting the exemption resolution, the Board did not commit District to any of the 12 proposed projects or foreclose alternatives to those projects. None of the cases cited by Taxpayers is factually apposite to this case or persuades us to reach a contrary conclusion. (See, e.g., *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229.) The Board's zoning exemption resolution did not constitute an "approval" under CEQA of any of the 12 proposed high school projects.

Second, the Board's zoning exemption resolution was not, in itself, a "project" under CEQA. The resolution was not itself "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" (Pub. Resources Code, § 21065), but rather related to 12 proposed

69

high school projects that, if approved by District, could constitute an activity that may cause a physical change in the environment. Alternatively stated, the Board's zoning exemption resolution was not an "activity" in itself that could cause any physical change in the environment. Each proposed high school project constituted an activity that could cause a physical change in the environment. The Board's resolution exempting those projects from City's zoning laws was not a separate activity requiring its own CEQA review in addition to the CEQA review required for each high school project. (Cf. Guidelines, § 15378, subd. (c) ["The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval."].)

Because the Board's zoning exemption resolution was neither an "approv[al]" nor a "project," that action was not subject to CEQA and did not require District to conduct any CEQA review before the Board adopted that resolution. (*Lexington Hills Assn. v. State of California*, *supra*, 200 Cal.App.3d at p. 430; *Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at p. 380.) Rather, before District approves each of the 12 high school projects, it must comply with CEQA. For example, in conducting the Initial Study and adopting the MND regarding the Project (i.e., Hoover's proposed project), District presumably recognized the Project was a "project" under CEQA that required CEQA compliance before it approved the Project.

G

Finally, Taxpayers asserts the trial court erred by dismissing its third cause of action because it necessarily prevailed on that cause of action when the Board adopted the zoning exemption resolution after Taxpayers filed the instant action.

In the third cause of action in its original complaint filed on February 9, 2011, Taxpayers alleged the Project was in violation of local laws and land use and planning principles. It also alleged the Project was not consistent with the purposes of applicable zoning and general plan. Taxpayers sought injunctive relief requiring District to reconsider the Project "consistent with requirements of applicable state and local laws." On May 10, 2011, the Board adopted the resolution exempting the Project (and 11 other high school projects) from City's zoning and land use laws. On July 7, 2011, Taxpayers filed its first amended complaint, which restated its original third cause of action and incorporated allegations challenging the Board's May 10, 2011, exemption action. That complaint requested relief setting aside that exemption action.

Based on our independent review of the original complaint, we conclude Taxpayers did not obtain the primary relief it sought in that complaint's third cause of action when the Board subsequently adopted the zoning exemption resolution. Taxpayers sought relief requiring District to reconsider its approval of the Project considering applicable zoning and land use laws. It did *not* seek relief *exempting* the Project from applicable zoning and land use laws. Therefore, when the Board adopted the zoning exemption resolution, Taxpayers did not obtain the primary relief it sought in its original third cause of action. *Belth v. Garamendi* (1991) 232 Cal.App.3d 896 and *Graham v.*

71

*DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, cited by Taxpayers, are factually inapposite and do not persuade us to reach a contrary conclusion. To the extent Taxpayers argues the exemption resolution somehow validated District's earlier failure to consider the Project's inconsistency with City's zoning laws when it adopted the Initial Study and MND, we conclude the exemption did not absolve District of its CEQA duty to consider any such inconsistencies before approving the Project. Rather, Board's resolution simply exempted the Project's classroom facilities from applicable zoning and land use laws before actual construction of the Project began, thereby avoiding any actual violation of City's zoning and land use laws. (*City of Santa Clara v. Santa Clara Unified Sch. Dist.* (1971) 22 Cal.App.3d 152, 158 [Gov. Code, § 53094 exemption may be made at any time].) Taxpayers did not prevail on its third cause of action when the Board adopted the zoning exemption resolution.[35]

---

[35] District filed a motion to compel correction of Taxpayers's reply brief by striking those portions referring to a document not contained in the record on appeal (i.e., August 9, 2011, memorandum of City's attorney). We deny the motion to correct, but nevertheless disregard those portions of Taxpayers's reply brief that refer to or discuss any documents not contained in the record on appeal, including the memorandum in question. (Cal. Rules of Court, rule 8.204(a)(2)(C); *Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1; *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 453, fn. 6; cf. *C.J.A. Corp. v. Trans-Action Financial Corp.* (2001) 86 Cal.App.4th 664, 673 [granting motion to strike portions of brief referring to evidence not contained in record on appeal].) Furthermore, because that memorandum is irrelevant to our disposition of this appeal, we deny Taxpayers's request that we take judicial notice of that document.

## H

Because we reject all of Taxpayers's assertions challenging and/or relating to the Board's zoning exemption resolution, we conclude Taxpayers has not carried its burden on appeal to show the trial court erred by dismissing its third and fourth causes of action.

## DISPOSITION

The judgment is reversed to the extent it dismissed the first and second causes of action; in all other respects, the judgment is affirmed. The matter is remanded with directions that the superior court grant the petition for writ of mandate and issue the injunctive and declaratory relief sought in the first and second causes of action of the first amended complaint and petition, to the extent consistent with this opinion, including, but not limited to, (1) ordering District to vacate its approval of the Project and the mitigated negative declaration (MND) and to cause an EIR to be prepared, and (2) enjoining District from using Proposition S bond proceeds to pay for field lighting at Hoover's stadium and any other high school stadium for which Proposition S did not specifically list field lighting as part of their projects. Taxpayers shall recover its costs of appeal.

McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.

73

Filed 4/25/13

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| TAXPAYERS FOR ACCOUNTABLE SCHOOL BOND SPENDING, | D060999 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2011-00085714-CU-WM-CTL) |
| SAN DIEGO UNIFIED SCHOOL DISTRICT, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent. | |


THE COURT:

The opinion filed March 26, 2013, is ordered certified for publication.

The attorneys of record are:

Law Office of Craig A. Sherman, Craig A. Sherman and Todd T. Cardiff for

Plaintiff and Appellant.

Dannis Woliver Kelley, Mark W. Kelley, Janet L. Mueller and Cameron C. Ward

for Defendant and Respondent.


McCONNELL, P. J.

Copies to: All parties